Michael SAVOIE, Plaintiff-Appellee
Cross-Appellant,

v.

OTTO CANDIES, INC., Defendant-Appellant Cross-Appellee.

No. 81–3084.

United States Court of Appeals,
Fifth Circuit.

Nov. 29, 1982.

Rufus C. Harris, III, Roger D. Allen, New Orleans, La., for defendant-appellant cross-appellee.

Leonard A. Radlauer, New Orleans, La., for plaintiff-appellee cross-appellant.

Appeals from the United States District Court for the Eastern District of Louisiana.

Before COLEMAN, POLITZ and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

This is an appeal from a judgment for damages rendered in favor of Appellee in an action brought under the Jones Act, 46 U.S.C. 688. Respecting the primary questions presented, we hold that there is sufficient evidence to support the jury's finding that Appellee was a Jones Act seaman at the time of his October 1979 injury; that the admission of evidence of maintenance payments made by Appellant to Appellee was not reversible error; and that there is sufficient evidence to support the jury's finding that Appellee was contributorily negligent. The trial court's judgment is affirmed.

I.

Appellant Otto Candies, Inc. is engaged in the marine transportation business. It employs approximately 300 workers and operates 80 vessels. In February 1978, Candies hired Appellee Michael Savoie to work as a deckhand aboard its vessels. Savoie worked as a deckhand until August 18, 1978, when he suffered a fractured leg in an automobile accident. A metal rod was inserted into Savoie's leg to provide support, and he was unable to work for about nine months.

Savoie returned to work on June 18, 1979, and was assigned to the M/V ADELLE CANDIES. He worked on this vessel as a deckhand until September 21, 1979, when he left work to have the metal rod removed from his leg. Savoie's doctor, Dr. Raymond Horn, surgically removed the metal rod on September 28, 1979. Dr. Horn told Savoie that he could return to regular duty in six weeks. On October 11, 1979, Dr. Horn released Savoie for light duty. On or about October 15, 1979, Savoie went to Candies' office and presented a duty slip, prepared by Dr. Horn's office, on which both light duty and regular duty were circled. A Candies employee, Wayne Andrus, after consulting with Dr. Horn's nurse, determined that Savoie was fit for regular duty, and Savoie returned to the M/V ADELLE CANDIES as a deckhand. On or about October 20, 1979, Savoie boarded the vessel. The next day, however, Andrus learned from Dr. Horn's office that Savoie was, in fact, restricted to light duty, and Andrus had Savoie taken off the vessel.

On October 26, 1979, Savoie went to Candies' office to pick up his paycheck. A Candies employee, Captain Welch, asked Savoie if he wanted a light duty job. Savoie accepted, and Captain Welch told him to be at the office the next morning. The next morning, Paul Candies, vice president of Otto Candies, Inc., told Savoie to clean some duck blinds owned by Otto Candies, Inc. and located on land leased by it.

The duck blinds were located in a pumped out marsh. In the area where Savoie was working, however, the ground was muddy, and the terrain was uneven. While he was cleaning the third duck blind, Savoie refractured his leg. This injury is the only one of relevance to this case.[1]

Savoie filed suit against Otto Candies, Inc. under the Jones Act. The jury, in response to special interrogatories, found that Savoie was a Jones Act seaman at the time of the October 1979 accident; that Otto Candies, Inc. was negligent, and that such negligence was a cause of the injury; that Savoie's damages were $80,000; and that Savoie was contributorily negligent in an amount of 20 percent. The trial court rendered judgment for Savoie for $64,000. Candies does not complain of the findings that its negligence was a cause of the injury, the percentage of negligence attributable to it, or the amount of Savoie's damages.

## II.

Candies contends that the jury's finding that Savoie was a Jones Act seaman is contrary to law and to the evidence. It argues that Savoie had no vessel connection when he was injured, for he was physically unable to work on a vessel, and therefore, not subject to the call of a vessel. We disagree.

■ The standard for testing a jury's finding that a worker is or is not a Jones Act seaman is whether there is a reasonable evidentiary basis to support that finding. Normally the question of seaman status in a particular case is to be resolved by the fact finder. *Senko v. LaCrosse Dredging Corporation,* 352 U.S. 370, 374, 77 S.Ct. 415, 417, 1 L.Ed.2d 404, 408 (1957) ("the determination of whether an injured person was a 'member of a crew' is to be left to the finder of fact"); *Abshire v. Seacoast Products, Inc.,* 668 F.2d 832, 835 (5th Cir. 1982);

*Guidry v. South Louisiana Contractors, Inc.,* 614 F.2d 447, 454 (5th Cir. 1980) ("seaman status ordinarily is a jury question"); *Hardaway Contracting Company v. O'Keeffe,* 414 F.2d 657, 660 (5th Cir. 1968); *Bodden v. Coordinated Caribbean Transport, Inc.,* 369 F.2d 273, 275 (5th Cir. 1966). Applying that standard here, we hold that there was sufficient evidence for the jury to find that Savoie was a Jones Act seaman when he was injured.

■ It is undisputed that Savoie was injured in the course of his employment for Candies and that he was a Jones Act seaman in Candies' employ at some point not long before his injury. Once it is established that a worker is a seaman, it is not necessary that the tasks he performs at the time he is injured be related to the service of a vessel. *Higginbotham v. Mobil Oil Corporation,* 545 F.2d 422, 432 (5th Cir. 1977), *rev'd on other grounds,* 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978).

"However, *Higginbotham* does not imply that a maritime worker assigned to work ashore for a very long period of time would continue indefinitely to be a seaman merely because it is contemplated that he will some day return to the vessel, nor that a seaman's status continues if he commences work for another employee." *Guidry,* 614 F.2d at 453.

The crucial question is whether Savoie remained a seaman on October 27, 1979, the date of his injury.

"[H]ow long a seaman's status continues after a shoreside assignment is itself a fact question dependent on such factors as the duration of the assignment, its relationship to the employer's business, whether the employee was free to accept or reject it without endangering his employment status and any other factors relevant to the ultimate inquiry: at the moment of injury was the employee a seaman by conventional Jones Act crite-

---

**1.** We reject Savoie's contention that his status as a Jones Act seaman at the time of his October 1979 injury is immaterial because that injury relates back to the August 1978 injury, which occurred when he was a seaman. There

is no evidence that Savoie's August 1978 injury was sustained in the course of his employment with Candies, nor is there any other evidence concerning his status at the time of the August 1978 injury.

ria who happened not to be on navigable waters, or was he at that time no longer a seaman whatever his past relationship ·or his future prospects?" *Guidry,* 614 F.2d at 453.

■ Seven days before his injury, Savoie was working aboard the M/V ADELLE CANDIES as a deckhand. As a. deckhand, it was Savoie's job to clean the vessel and to keep it in shape. Although there is no evidence of precisely how long Savoie's assignment to clean the duck blinds was to last, it is quite evident 'that it was not a task of extended duration, and Savoie had worked on the blinds only an hour before he was injured. Moreover, Savoie was to return to regular duty aboard the M/V ADELLE CANDIES in two weeks. The duck blinds were used to entertain Candies' business clients, and the evidence shows that Savoie was reluctant to reject his employer's direction that he clean them.

Apart from the factors listed in *Guidry,* Candies argues that Savoie was physically incapable of performing his duties aboard a vessel. There is, however, no conclusive evidence that Savoie was physically incapable of performing light duty aboard a vessel.[2]

In summary, the evidence was sufficient to support a finding that the assignment to clean the duck blinds was temporary; and that most recently when Candies considered Savoie healthy, he was routinely reassigned to "his" vessel as a deckhand. Nothing in the record conclusively establishes that Savoie's general pattern of employment with Candies as a deckhand was changed by the temporary assignment to clean its duck blinds. *Higginbotham,* 545 F.2d at 433.

■ Candies contends that the trial court's charge to the jury concerning seaman status was strongly prejudicial, and in effect, compelled the jury to find that Sa-

voie was a seaman when he was injured. We disagree.

The court instructed the jury as follows:

"A seaman is injured 'in the course of his employment' when, at the time of injury, he was doing the work of his employer, that is, he was working in the service of the vessel as a member of her crew.

"Now, in order for the plaintiff to establish that he was a 'member of the crew' of a vessel, he must prove that he was assigned more or less permanently to the vessel, or that he performed a substantial part of his work on it. He must also prove that the capacity in which he was employed or the duties that he performed contributed to the function of the vessel's regular operation or to the accomplishment of its mission.

"A Jones Act 'seaman,' however, can still recover from his employer even for injuries received while he is on shore. Nor does the act require that the tasks he is performing at the time he is injured be related to service of the ship. A seaman does not lose his status when he is temporarily assigned by his employer to duties off the vessel.

"How long a seaman's status continues after a shoreside assignment is itself a question of fact for you, ladies and gentlemen of the jury, to decide. The answer to this question depends on such factors as the duration of the assignment, its relationship to the employer's business, whether the employee was free to accept or reject it without endangering his employment status and any other factors relevant to this issue. You must make the ultimate determination as to whether or not plaintiff remained a Jones Act seaman at the time of his injury. That's strictly up to you, ladies and gentlemen of the jury."

---

**2.** Candies also relies on the fact that Savoie was "discharged" from the ship on October 20 or 21. However, Savoie explained that such "discharges" were routinely given to seamen who were expected to return to the vessel in a few days. Thus, crews on a vessel might customarily work a seven day "on" and seven day

"off" schedule, and would routinely be given a discharge slip at the end of each "on" week, though they were expected to return to their duties the following week. This "discharge" evidence is hence not conclusive on the question of Savoie's status as a seaman.

We hold that this instruction was proper in the context of this case. It sets forth the law of seaman status as explained in *Guidry,* 614 F.2d at 453. Although the trial court focused the jury's attention on the question of whether Savoie "remained a Jones Act seaman at the time of his injury," the court emphatically told the jury that this was "strictly" a question for them. Moreover, this was the crucial issue, for it was undisputed that Savoie was a seaman, and in Candies' employ as such, not long before his injury, which admittedly occurred in the course of his employment for Candies.

Candies makes several contentions concerning the trial court's refusal to instruct the jury on certain matters pertaining to seaman status. These proffered instructions were properly refused, for they were either erroneous or unnecessary.

### III.

During the trial, Savoie introduced into evidence letters sent by Candies' attorney and its insurance carrier to Savoie and his attorney, which revealed that Candies had paid Savoie maintenance after the October 1979 injury. Because maintenance is paid to seamen only, Savoie argued that the maintenance payments showed that Candies considered him to be a seaman when he was injured. The letters were admitted into evidence, over Candies' objections, as statements of a party opponent or his agent. *See* Fed.R.Evid. 801(a) and 801(d)(2). Savoie's attorney and the court examined Paul Candies about the maintenance payments, and Savoie's attorney heavily emphasized them in his closing arguments to the jury. At the conclusion of the trial, the court instructed the jury as follows:

"Evidence has been introduced at this trial showing that the defendant has paid 'maintenance' to the plaintiff. 'Maintenance' is defined as the providing to a seaman, who is disabled by injury or illness while in the service of the ship, medical care and treatment, and the means of maintaining himself, during the period of his convalescence.

"The payment of 'maintenance' by defendant, however, is not determinative of plaintiff's seaman status for his Jones Act negligence claim. The fact question of whether or not plaintiff is a seaman for this suit still has to be decided by you, ladies and gentlemen of the jury, based on the law as I have previously defined it for you."

Candies argues that evidence of maintenance payments was wholly irrelevant on the issue of Savoie's status as a Jones Act seaman, and that the jury instruction regarding maintenance was prejudicial.

We reject these contentions. Contrary to Candies' assertions here and below, its payment of seaman's maintenance was not totally irrelevant. Candies had originally brought out that Savoie was "discharged" from the vessel (*see* note 2, *supra*), and this evidence tended to cast light on whether or not such "discharge" was intended to fully terminate Savoie as a Candies seaman, as opposed to being merely a routine formality when a seaman was temporarily rotated off the ship and expected to soon return to his duties there in accordance with normal practice. These payments tended to show that Candies regarded Savoie as being a seaman at the time of the accident, notwithstanding his prior "discharge." This, in turn, was relevant to whether, when Savoie left the vessel and throughout his absence from it, there existed a mutual understanding and intention that his absence did not fully sever all aspects of his relationship to the Candies fleet and that, immediately following a brief period of recuperation, he would return to the actual performance of his duties as a deckhand upon the M/V ADELLE CANDIES.[3] In a case of this

---

**3.** *See, e.g., Employers Mutual Casualty Co. of Des Moines v. Mosqueda,* 317 F.2d 609, 612–13 (5th Cir. 1963). There plaintiffs were injured in a collision with a truck driven by Buchanan and owned by his employer, Albright. Plaintiffs had previously sued Albright and Buchanan, and recovered judgment only against the latter. As they were unable to collect the judgment, they then sued Employers Mutual, Albright's liability insurer, claiming that Buchan-

kind, such factors, though not necessarily determinative in and of themselves, form a proper part of the overall factual pattern upon the basis of which the ultimate factual inquiry concerning seaman status at the time of injury is properly resolved.

Candies relies on *Hokanson v. Maritime Overseas Corporation,* 1974 A.M.C. 948 (E.D.La.1974), but that decision is not in point. *Hokanson* merely held that the payment of maintenance under protest (Candies does not assert that its payments here were made under protest) did not constitute a binding "admission of liability" on the part of the maritime employer such as to "estop" it from contesting the seaman's entitlement to maintenance. We have no occasion to disagree with *Hokanson.* It was not contended below, and we do not hold, that Candies' payment of maintenance to Savoie was an admission of liability, or that it was *determinative* of seaman's status. We merely hold that these payments, *not* made under protest, were relevant evidence, for above-indicated purposes, on the issue of seaman status, particularly in light of Candies' having raised the matter of an alleged "discharge."

Although not cited by either party, consideration on this issue must be given to the Supreme Court's decision in *Tipton v. Socony Mobil Oil Co.,* 375 U.S. 34, 84 S.Ct. 1, 11 L.Ed.2d 4 (1963), *reversing* 315 F.2d 660 (5th Cir. 1963). *Tipton* was a Jones Act suit by an employee of the defendant whose primary duties were those of roughneck as a member of defendant's drilling crew on its offshore fixed drilling platform, which

was not a "vessel." The drilling platform, however, was tended by one of defendant's barges, concededly a "vessel," and as a part of his employment plaintiff occasionally performed various tasks aboard the barge, and was injured while doing such seaman's work. Under the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1331, *et seq.,* workers' compensation benefits provided by the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 901, *et seq.,* were available to offshore drilling employees not a "member of a crew of any vessel." 43 U.S.C. § 1333(c)(1). As the Supreme Court noted, at trial "[t]he principal issue was whether, in view of the nature of the work performed at the time of the injury, the petitioner was a seaman, hence within the coverage of the Jones Act, or an offshore drilling employee" covered by the LHWCA through the OCSLA. 375 U.S. at 34, 84 S.Ct. at 1. Judgment was rendered for the defendant on the jury's finding that plaintiff was not "a seaman, or a member of the crew of" the barge. 315 F.2d at 661.

On appeal, this Court held it was error to admit, over proper objection, evidence that plaintiff had received and retained compensation benefits under the LHWCA, but that the error was harmless since the jury did not reach the damage issue. Judge Brown dissented, being of the view that the error was harmful inasmuch as the entire theme of the defense at trial had been that the jury did not have to worry about the plaintiff since he was adequately provided for under the LHWCA.[4] Judge Brown, noting

---

an was an additional insured under the policy it had issued Albright on the truck. Buchanan's status as an additional insured turned on whether at the time of the accident his operation of the truck was with the express or implied permission of Albright. Buchanan at that time had deviated from his normal route for personal reasons. We held that it was proper to show, on the question of Buchanan's status, that the defendant Employers Mutual had paid Buchanan's legal fees incurred in a criminal proceeding growing out of the accident:

"It showed that at least at one time, an agent of Employers Mutual having a responsibility for handling claims against the company con-

sidered that Buchanan was covered under the terms of the policy." *Id.* at 613.

4. Judge Brown's dissent notes "the preoccupation with this problem of the Longshoremen's Act throughout the whole trial," 315 F.2d at 663, and the jury argument of defendant's counsel:

" 'But recall that Mr. Tipton is not without a legal remedy. He was paid, as the evidence shows, compensation benefits under the Longshoremen's and Harborworkers' Act, and he was offered further benefits .... Mr. Tipton was paid approximately $1,400 in compensation benefits .... He is not without a right [since] ... we admitted he was

that the jury had specifically inquired "if we find Mr. Tipton is not a seaman ... does he have recourse for compensation under the Outer Continental Shelf or other act?", observed that "it is perfectly plain ... that in trying to fashion their answer [to the issue of whether plaintiff was a seaman] ... the jury did not wish to take any action which would cut the plaintiff off from further benefits." 315 F.2d at 666. The Supreme Court reversed this Court's determination that the complained of evidence was harmless. It observed:

> "There can be no doubt that the evidence of other benefits was pressed upon the jury. Throughout the trial respondent's counsel emphasized that the petitioner 'has a remedy under a federal compensation act, and in fact received benefits in the form of weekly payments under that act ....'" 375 U.S. at 35, 84 S.Ct. at 2.

The Court specifically noted the above-referenced inquiry made by the jury, *id.* at 36, 84 S.Ct. at 2, and stated:

> "Indeed, the jury's inquiry to the judge seems to indicate that, under the case as submitted, the jury was led to place undue emphasis on the availability of compensation benefits in determining the ultimate question of whether the petitioner was a seaman within the Jones Act. On such a record the disputed evidence cannot properly be deemed harmless." *Id.* at 37, 84 S.Ct. at 3.

This Court's majority and dissenting opinions in *Tipton* seem to *assume* that evidence of the compensation payments was not admissible for *any* purpose. However,

the Supreme Court's opinion does not so state, and, on the contrary, appears to recognize that such evidence would have been properly admissible for a limited purpose:

> "The only argued relevance of this evidence was that it indicated what the petitioner had thought to be his legal status. The judge did not, however, frame a cautionary instruction or otherwise charge the jury that the evidence of other compensation might be considered only insofar as it revealed what the petitioner and others thought his status to be—whether seamen or drilling employee—and was not dispositive of the ultimate fact of whether he was a seaman." *Id.* at 35–36,[5] 84 S.Ct. at 2.

It is plain that the vice which the Supreme Court found in *Tipton* was the defense's use of the evidence to persuade the jury *not* that the plaintiff was in fact a drilling employee instead of a seaman, but rather that he should not recover under the Jones Act because he had already been, and would in the future be, compensated under the LHWCA. That *this* use of the evidence had its intended effect was evident from the jury's inquiry. Such a vice is similar to that presented by evidence that the defendant is insured. *See Eichel v. New York Central R. Co.,* 375 U.S. 253, 255, 84 S.Ct. 316, 317, 11 L.Ed.2d 307 (1963). However, even evidence that a person has liability insurance may be admissible when it is relevant to some disputed matter other than simply whether that person acted negligently or otherwise wrongfully. Fed.R. Evid. 411.[6]

covered under the [Longshoremen's] Act.... He is not without a remedy; ...'" 315 F.2d at 664.

**5.** The Court also observed that the trial judge, in his answer to the above-noted inquiry by the jury, "did not preclude *or restrict* consideration of the evidence presented concerning prior receipt of compensation payments." 375 U.S. at 36, 84 S.Ct. at 2 (emphasis added).

**6.** We do not believe our analysis of *Tipton* is at variance with our holding in *Bourque v. Diamond M. Drilling Company,* 623 F.2d 351 (5th Cir. 1980). *Bourque* was a Jones Act suit where this Court reversed because of a conflict in the jury finding that plaintiff suffered an

injury as a result of defendant's negligence but no damages, even though following the incident he plainly had pain and suffering. Subsequent to this injury plaintiff went to work for another employer and was again injured. Defendant introduced evidence that plaintiff was receiving compensation benefits in respect to his second injury from his subsequent employer's compensation carrier. To give guidance for retrial, this Court stated that the collateral source rule "prohibits the introduction of evidence offered to show that the employee already has been compensated for his injuries," *id.* at 354, and that the Federal Rules of Evidence did not repeal the collateral source rule. *Id.* at 354 n. 1. This is obviously correct, as the collateral

Here, no improper use was made of the evidence of Candies' maintenance payments. They were not used to urge that the jury should find for Savoie because Candies had demonstrated its financial ability to pay for his injury, or to show that Candies was negligent or had admitted liability, or to show the extent of Savoie's injury or damages. There is no claim of prejudice as to any of such matters. The evidence was used only on the question of seaman status, and even there not as being a matter determinative of such status. The trial judge was careful to instruct the jury that this evidence was not determinative, and that notwithstanding the maintenance payments the issue of seaman status remained a fact question to be resolved by the jury *under* the law as covered by the *other* portions of the court's charge. The referenced portions of the charge, which correctly set out the standards for the determination of seaman status, did not allude to the payment of maintenance. The jury was told, in effect, that the payment of maintenance could only be considered as circumstantial evidence of the other factual elements going to the issue of seaman status.[7]

We do not suggest that more extensive and explicit limiting instructions would not have been desirable, both when the evidence was admitted and in the trial court's final charge. However, where evidence is admissible for one purpose but not another, the burden is on the objecting party to request a proper limiting instruction. Fed.R.Evid. 105. Here, no such request was made, Candies simply having taken the position that the evidence was admissible for no purpose whatever and the jury should be instructed to totally disregard it for any purpose. *See* Fed.R.Civ.P. 51. Any error in this regard was accordingly waived. Nor do we deem any such deficiency to be so egregious or prejudicial here as to warrant reversal in the absence of a proper request for more explicit limiting instructions.

We recognize that under Fed.R. Evid. 403 "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Decisions under this rule are committed to the trial court's sound discretion. *See Harpring v. Continental Oil Co.*, 628 F.2d 406, 409–10 (5th Cir.

source rule is a rule of substantive law. *See, e.g., Parker v. Wideman*, 380 F.2d 433, 436 (5th Cir. 1967). Our opinion also observes, 623 F.2d at 354, that *Tipton* reversed where such evidence was admitted, even though the evidence had independent relevance. The *Bourque* opinion, however, does not address the language in *Tipton* indicating that in certain instances of that kind a limiting instruction might be a sufficient way of handling the collateral source concerns. Nothing in the *Bourque* opinion reflects whether there was any independent relevance there, and the facts indicate that if there was it was obviously highly attenuated. The concluding sentence of *Bourque* indicates that evidence showing the plaintiff had made a claim for compensation might be admissible if the trial court reasonably determined that "a cautionary instruction would be sufficient to prevent the jury from considering the evidence for an improper purpose." *Id.* at 354.

7. We do not regard this evidence as inadmissible under Fed.R.Evid. 409, concerning payment of "medical, hospital or similar expenses." These $56 per week "maintenance" payments were not shown to be "expense" payments of any kind. Candies never contended they were such, and its objection was based solely on relevancy, not on the principles of Rule 409.

Moreover, Rule 409 only denies admissibility "to prove liability for the injury." Such evidence may be admissible to prove other facts, such as "the status of the alleged tort-feasor as employer." Weinstein's *Evidence* § 409[2]. Here, the questioned evidence was not used to establish Candies' negligence, but only as circumstantial evidence of Savoie's status as a seaman. Were the only issue in the case the entitlement to medical or hospital or similar expenses, then proof of payment of a portion of such expenses might properly be labeled as going only to the issue of liability, and hence inadmissible under Rule 409. *See Hokanson.* Even if there were some slight relevance on another issue, in a suit only for maintenance and cure the principles of Fed.R.Evid. 403 might still operate to exclude such evidence.

We further emphasize that we are not dealing with *any* kind of payments made or offered under protest or with express disclaimer or reservation of rights or the like. Nor are we dealing with anything that can be characterized, under the facts of this case, as an offer of compromise or settlement. Such situations might well call for a result different from that which we reach here.

1980), *cert. denied,* 454 U.S. 819, 102 S.Ct. 100, 70 L.Ed.2d 90 (1981). McCormick, *Evidence* § 185 at 439, n. 31 (2d ed.), observes "[I]t should be emphasized that prejudice, in this context, means more than simply damage to the opponent's case. . . . What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one." We cannot find an abuse of discretion under the facts of this case. The evidence did not have overwhelmingly strong potential for *improper* use, such as proof of liability insurance evidence generally does. The probative value of this evidence was enhanced here by reason of its particular relevance in explanation of the "discharge" evidence brought out by Candies. We observe that the jury found Savoie 20 percent negligent, and does not appear to have been "carried away" by any improper motivations against Candies or in favor of Savoie.[8]

Accordingly, we reject Candies' claim that reversible error is presented by the admission of the evidence of maintenance payments and the charge of the court in regard thereto.

## IV.

Savoie cross-appeals, claiming that there is insufficient evidence to support the jury's finding that he was contributorily negligent. We disagree.

A seaman has some duty to use reasonable care to protect himself even though that duty is slight. *Bobb v. Modern Products, Inc.,* 648 F.2d 1051, 1056–57 (5th Cir. 1981). Savoie testified that Dr. Horn told him to do light work only until released for regular duty. On the day of the accident, Savoie's leg was weak, but he persisted in cleaning the duck blinds in an area that he himself described as a muddy, uneven marsh. Savoie's father had brought him to the Candies office prior to commencing work on the morning the accident occurred. There was evidence that Savoie's father, a former long-time Candies employee, had asked Paul Candies to give his son work, and indicated he "was capable of doing work" and there were "no problems" with his working around the blinds. While the father gave contrary testimony, the jury was not required to credit it. The jury could conclude that Savoie not only knew his own condition better than did Candies,

---

**8.** There is language in *Sheehy v. Southern Pacific Transportation Co., Inc.,* 631 F.2d 649, 652 (9th Cir. 1980), apparently indicating that in a typical case Fed.R.Evid. 403 does not allow a trial court any discretion to admit evidence which is irrelevant under the collateral source rule even though it is relevant for another purpose. We need not directly rule on this question, as we are not here faced with a typical "collateral source" question. However, we do decline to apply the *Sheehy* approach to the question presented in the case at bar. We observe that *Sheehy* apparently interprets the last sentence of the Advisory Committee's Notes on Rule 403 to mean that other "rules" of evidence, *including* those *not* contained in the Federal Rules of Evidence but merely reflected by court decisions rendered prior thereto, override or limit the discretion provided in Rule 403. However, the text of the next to last sentence of this paragraph of the Notes ("[t]he rules which follow in this Article") indicates that the word "they" in the last sentence of that paragraph refers not to "rules" in the general, generic sense of principles established by court decisions, but rather to the various specific "rules" set out in the Federal Rules of Evidence (*e.g.,* Rule 409, payment of medical expenses; Rule 411, liability insurance). More-

over, *Sheehy* does not address either Fed.R. Evid. 105 (limited admissibility) *or* Fed.R.Evid. 402 ("all" relevant evidence admissible except where excluded under the Constitution, statutes, "these rules," or other rules made by the Supreme Court "pursuant to statutory authority"). *Sheehy* also relies on *Riddle v. Exxon Transportation Co.,* 563 F.2d 1103 (4th Cir. 1977), apparently reading *Riddle* as holding that *Tipton* requires a jury instruction to completely disregard "collateral source" evidence for *any* purpose. *Riddle,* however, held such an instruction was *sufficient* and had no occasion to explore whether a more limited instruction, allowing consideration for a limited proper purpose (if realistically present in the case), would be sufficient under *Tipton's* "might be considered only insofar as it revealed what the Petitioner and others thought his status to be" language, 375 U.S. at 35, 84 S.Ct. at 2. *Sheehy* further relies on *Eichel.* However, in *Eichel* the Supreme Court *sustained* the *district court's* exclusion of "collateral source" evidence, despite its asserted relevance to malingering, on the ground that "the likelihood of misuse by the jury clearly outweighs the value of this evidence." 375 U.S. at 255, 84 S.Ct. at 317. This does not appear inconsistent with Rule 403.

but also knew, or should have known, that Candies was not fully informed in this regard, and that Savoie failed to even suggest to Candies any possible difficulty with his work assignment. Where a seaman knowingly exposes himself to conditions of employment while aware of an illness or disability which makes those conditions unsafe to him, or where a seaman has the possibility of securing relief from unsafe conditions by informing his superiors of them, but continues to work without doing so, he may be found to be contributorily negligent. *Ward v. Union Barge Line Corporation,* 443 F.2d 565, 569 (3d Cir. 1971); *Mroz v. Dravo Corporation,* 429 F.2d 1156, 1163–64 (3d Cir. 1970); *DuBose v. Matson Navigation Company,* 403 F.2d 875, 879 (9th Cir. 1968); *Webb v. Dresser Industries,* 536 F.2d 603, 609 (5th Cir. 1976), *cert. denied,* 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 572 (1977). We hold that the jury's finding of contributory negligence on the part of Savoie is supported by sufficient evidence.

The trial court's judgment is affirmed.

AFFIRMED.